# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- ) | |
| ) | |
| C.R. Pittman Construction Co., Inc. ) | ASBCA Nos. 57387, 57388, 57688 |
| ) | |
| Under Contract No. DACW29-00-C-0075 ) | |

APPEARANCES FOR THE APPELLANT: Gerald A. Melchiode, Esq.
Jeffery B. Struckhoff, Esq.
  Galloway, Johnson, Tompkins,
   Burr & Smith
New Orleans, LA

APPEARANCES FOR THE GOVERNMENT: Thomas H. Gourlay, Jr., Esq.
  Engineer Chief Trial Attorney
William G. Meiners, Esq.
  Engineer Trial Attorney
  U.S. Army Engineer District, New Orleans

## OPINION BY ADMINISTRATIVE JUDGE WILSON

These appeals originate from claims filed under a construction contract for improvements to the Soniat Canal in Jefferson Parish, Louisiana.[1] The contract required, *inter alia*, C.R. Pittman Construction Co., Inc. (appellant or Pittman) to increase the drainage capacity of the existing drainage canal by lining it with concrete and increasing the cross-sectional area by excavation. Appellant filed three claims alleging the following: (1) a Type II differing site condition regarding removal of sheet piling (ASBCA No. 57387); (2) delays due to flood events (ASBCA No. 57388); and (3) breach of contract by the Corps due to the deletion of gravity sewer line work from the contract (ASBCA No. 57688). The Board has jurisdiction of the appeals under the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109. The Board held a hearing in New Orleans, Louisiana, on the above-captioned appeals. The parties have submitted post-hearing and reply briefs. Only entitlement is before the Board for decision.

---

[1] The Board previously issued a decision under the same contract denying entitlement to additional delay costs associated with timber mats. *See C.R. Pittman Constr. Co.*, ASBCA No. 54901, 08-1 BCA ¶ 33,777. Familiarity with that decision is presumed.

## FINDINGS OF FACT

A. *The Contract*

1. On 25 July 2000, the United States Army Corps of Engineers (government or Corps) awarded Contract No. DACW29-00-C-0075 to appellant in the amount of $14,426,258 for the "Southeast Louisiana Urban Flood Control Project, Improvements to Soniat Canal" in Jefferson Parish, Louisiana (R4, vol. II, tab D). The fixed-price contract required appellant to increase the drainage capacity of the existing drainage canal by lining the canal with concrete and increasing the canal cross-sectional area by shallow excavation. Upon completion of the project, the canal would convey storm runoff from Metairie, Louisiana, towards a pumping station in Jefferson Parrish and ultimately into Lake Pontchartrain. (ASBCA No. 57387 (57387), compl. and answer ¶ 8; tr. 1/28) The contract further required completion of the work within 900 calendar days of the receipt of "Notice to Proceed," which was issued and received on 28 July 2000 (57387, compl. ¶ 9; supp. R4, tab 3; R4, vol. II, tab D). Thus the contract completion date was 14 January 2003.

2. The contract contained the following standard clauses: Federal Acquisition Regulation (FAR) 52.233-1, DISPUTES (DEC 1998); FAR 52.243-4, CHANGES (AUG 1987); Defense Federal Acquisition Regulation Supplement (DFARS) 252.243-7001, PRICING OF CONTRACT MODIFICATIONS (DEC 1991); and DFARS 252.243-7002, REQUESTS FOR EQUITABLE ADJUSTMENT (MAR 1998) (R4, vol. II, tab D).

3. The contract contained the standard FAR 52.232-5, PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS (MAY 1997) clause, which stated in relevant part:

> (1) The Contractor's request for progress payments shall include the following substantiation:
>
> (i) An itemization of the amounts requested, related to the various elements of work required by the contract covered by the payment requested.
>
> ....
>
> (2) In the preparation of estimates, the Contracting Officer may authorize material delivered on the site and preparatory work done to be taken into consideration....
>
> ....

2

(f) *Title, liability and reservation of rights.* All material and work covered by progress payments made shall, at the time of payment, become the sole property of the Government....

(R4, vol. II, tab D at 58-60) The contract also contained FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984) which reads:

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(*Id.* at 73)

4. Additionally, the contract contained the following special provision in pertinent part:

52.231-5000, EQUIPMENT OWNERSHIP AND OPERATING EXPENSE SCHEDULE (MAR 1995) -- EFARS

    ....

(b) Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records.

3

When both ownership and operating costs cannot be determined...costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region III.

(R4, vol. II, tab D at 58)

B. *Additional Findings of Fact Pertaining to ASBCA No. 57387 Type II Differing Site Condition (Sheet Piling) Claim*

5. The contract also contained the following provision:

SECTION 02252 – TEMPORARY RETAINING STRUCTURES

PART 1    GENERAL

1.1    SCOPE

This work shall consist of designing, furnishing, installing, maintaining and subsequently removing all temporary retaining structures required to complete this project. The Contractor shall be solely responsible for the design, layout, construction, maintenance and subsequent removal and disposal of all elements of the temporary retaining structures.

1.2    MEASUREMENT AND PAYMENT

No measurement will be made for work specified in this section. Payment will be made at the contract lump sum price for "Temporary Retaining Structures". Price and payment shall constitute full compensation for furnishing all plant, labor, materials, and equipment; designing, furnishing, installing, maintaining, and removing the temporary retaining structures, backfilling voids, and all other work incidental thereto.

....

4

1.4.2 Elevations

The retaining structures shall have sufficient height to retain the soil between them. The minimum tip elevation shall be (-) 52 feet C.D.

....

PART 3    EXECUTION

....

3.2    REMOVAL OF MATERIAL

3.2.1  Removal Criteria

...All Contractor-furnished temporary retaining structures shall be removed from the site of work upon completion of work.

3.2.2  Safety

The removal of the temporary retaining structures shall be accomplished in a manner not injurious to the properties adjacent to and in the proximity of the project excavations.

(R4, vol. II, tab D at 232-33, 235)  Additionally, Section 02252 was amended (via Amendment No. 0003) during the solicitation phase of the procurement to add the following language: "Any and all costs for retaining structures required to remain in place in the vicinity of the transmission towers...shall be included in the contract lump sum price for 'Temporary Retaining Structures'" (*id.* at 385).

6. The contract gave appellant the option to perform the work from an elevated work platform or on a bank adjacent to the canal where available.  Appellant chose to build an elevated platform in order to construct the Temporary Retaining Structure (TRS) required by Item 0008 of the contract. (Tr. 1/153, 2/16-17)  Item 0008 of the bidding schedule called for appellant to provide the TRS for a total price of $4,575,000 (R4, vol. II, tab D at 3).  The purpose of the TRS was to retain the earth on each side of the canal to allow for excavation and the placement of concrete (tr. 1/29).

7. On 14 November 2000, appellant submitted its TRS design to the government for approval. The submission provided in part:

5

### Overview:

Our temporary retaining structure for use in the construction of the concrete flume of the Soniat Canal consist of utilization of an Internally Braced earth retaining structure system. Our system consist [sic] of utilization of a steel sheetpiling wall line with walers and struts...utilizing the AZ-18 rd.04" Arbed Steel Sheetpiling at 70 ft. long as specified via the project plans....

    ....

The internally braced components will be a W24 and W36 fabricated waler beams and 16 inch and 24 inch diameter pipe strut members....

    ....

### Submittals:

### Design:

Design calculations have been prepared utilizing the design procedures, loads, factors of safety, etc as detailed via Section 02252 of the contract documents. The earth pressure results...have been developed by our geotechnical consultant, Mr. Mohammad Tavassoli Ph.D....while, the structural design components have been done by our firm's Engineers.

    ....

### Steel Sheetpiling Installation & Removal:

    ....

Once the earth retaining structure is not necessary, the temporary sheetpiling not required to remain in the ground will be extracted.... Once pulled the sheetpiling will be stacked and then loaded on to truck[s] to be remove[d] from or transported to another location on the project site.

(R4, vol. 1, tab D at 2-3) Steel sheet pilings are long structural sections with a vertical interlocking system that creates a continuous wall. The walls are most often used to

6

retain either soil or water. (Supp. R4, tab 15) The sheet piles are placed in the ground by a vibrating hammer, which drives the piling into the soil (tr. 1/46-47). Permanent sheet piles remain in the ground and serve as permanent retaining structures. Temporary sheet piles are designed to provide safe access for construction, and are then removed. (*Id.*) The record reflects that appellant used 70 ft. long AZ-18 sheet pilings as set forth in the TRS design submission (R4, vol. I, tab D).

8. The record further demonstrates that TRS work was performed and appellant billed the government for that work as of 7 December 2000 and 12 January 2001 (supp. R4, tabs 9, 10). By letter dated 21 February 2002, appellant notified the Corps that it was experiencing difficulties extracting the sheet piling from the ground on the project. Appellant stated:

> We have try [sic] different vibratory hammers and have try [sic] to change the rpm's so that it might decrease the vibration readings....
>
> Since the U.S. Corps of Engineers provided the length criteria that these sheetpiling were to be, could you please advise as to our next step in removing the sheetpiling. We did not have figured in our bid price to leave any sheetpiling in the ground except what was to remain on the east side as shown on the contract plans.

(R4, vol. I, tab E)

9. The Corps responded, by letter dated 11 March 2002 advising as follows:

> The contract language regarding this subject is clear – the minimum tip elevation of the temporary sheetpiling and the criteria for maximum allowable vibrations during driving or pulling are clearly stated. The methods you use for sheetpile installation and removal shall comply with these vibration requirements. You may, however, elect to leave sheetpile in place instead of pulling them, provided the remaining sheetpile are cut off a minimum of 2 feet below finished grade and provided there is no additional cost to the Government.

(R4, vol. I, tab F)

10. On 28 May 2002, appellant sent an inquiry to the CO requesting guidance on the specifics as to the sheet piling to be left in the ground (R4, vol. I, tab G).

Further, by letter dated 4 August 2002, appellant replied to the Corps' 11 March 2002 correspondence indicating that it disagreed with their position. Appellant stated:

> As you are well aware, we have been frugally trying to remove the sheetpiling so that these materials can be moved to be utilize [sic] in our Phase 2 of construction. Due to circumstances beyond our control we have not been able to extract some of the sheetpiling from out of the ground.
>
> ....
>
> There are seventy-five sheetpiling that had to be left in the ground during our Phase I of construction (Monoliths 2 thru 19). These sheetpiling do not include the sheetpiling that were left in the ground next to the Entergy transmission tower on the eastside, nor the sheetpiling that are to remain in front of the two houses on the westside per the two modifications (CIN-13 and CIN-33).
>
> In this breakdown we have included extended overhead for 21 days and request a contract time extension of 45 days for delays and the time it will take to procure the materials.

(R4, vol. I, tab H at 1-2) Appellant also invoked the Differing Site Conditions clause and included a cost proposal in the amount of $396,404.18. The proposal included costs associated with the following: (1) repairs to a crane which was allegedly damaged due to the excessive vibrations expended to unsuccessfully extract the sheet piling from the ground; (2) labor expended to remove the sheet piling; (3) replacement costs for the 75 sheet piles; (4) front office overhead; and (5) overhead, profit, and bond costs. (R4, vol. I, tab H) The record contains a drawing that demonstrates where the sheet piling was left in place along the east and west sides of the canal starting with Monolith 8 through Monolith 19 (R4, vol. I, tab H at 3; supp. R4, tab 29; tr. 1/53).

11. By letter dated 23 August 2002, the Corps responded to appellant's earlier 28 May 2002 inquiry stating: "The decision on where sheet piling is to remain in place is made on a case-by-case basis after considering all factors related to the removal of the sheeting" (R4, vol. I, tab I). The record shows that the parties went back and forth over several months about what specific "factors" should be taken into account when deciding to leave the sheet pilings in place (R4, vol. I, tabs J, K, L).

12. By letter dated 15 November 2002, the Corps transmitted unilateral Modification No. P00033, which directed appellant to leave portions of the TRS sheet pilings in place at various locations along the west side of the Soniat Canal. The

8

modification, which did not include any change to the contract price, stated "Payment for work required by this change will be directed by a separate formal modification which will contain an agreed upon equitable adjustment." (Supp. R4, tab 26 at 2-3)

13. On 15 January 2003, appellant filed a claim in the amount of $396,404.18 (app. supp. R4, vol. I, tab 13). The claim included the attachment with the cost breakdown as previously provided with the 4 August 2002 letter (tr. 1/71).

14. By letter dated 8 April 2003, appellant advised the Corps that during Phase 2 construction it had exhausted all of its resources on trying to extract sheet pilings still embedded in the soil and that it was "due to circumstances beyond its control." Once it documented all of the sheet piles it was unable to remove, appellant advised the Corps that it would be filing a claim for the costs for the labor and equipment associated with the attempted removal and the materials left in the ground. (R4, vol. I, tab M)

15. The Corps responded, by letter dated 21 April 2003, requesting the specifics of what the Corps interpreted as notice of a differing site condition so that it could investigate and respond accordingly (R4, vol. I, tab N).

16. By letter dated 3 November 2003, appellant notified the Corps with regard to the sheet piling issue the following information:

> The Differing Site Condition that we have encountered falls into the category of a Type II [Differing] Site Condition....
>
> ....
>
> We believe that what we encountered in the removal process differs materially from the contract and what we reasonably expected in the development of our bid on this project....

(R4, vol. I, tab O at 1-2)

17. The record shows that the Corps conducted a site investigation on 16 December 2003. The Corps' geotechnical engineer who visited the site, Mr. Larry Dressler, opined to other Corps employees that appellant should drive the piles in deeper in order to break the adhesion, and then extract them. (R4, vol. I, tab P) There is no evidence that this information was passed on to appellant until 23 February 2004, when the Corps wrote a letter to appellant advising that appellant drive the piles deeper in order to break the seal. Further, the Corps requested that appellant specifically define the subsurface or hidden condition so that it could investigate further. (R4, vol. I, tab Q). However, appellant had

9

cut the sheet piles that it could not remove from the soil and had moved the TRS further down the canal to continue work (tr. 2/70-71).

18. The record shows that the parties continued to negotiate several outstanding modifications and claims. By letter dated 2 November 2009, appellant requested that the parties meet to negotiate the unresolved claims; which consisted of 14 items, including the sheet piling claim ($396,404.18), the flood events claim ($1,422,728.88), and the deletion/modification of the gravity sewer line ($516,667.77). Appellant also submitted a claim certification for all unresolved claims over $100,000. (App. supp. R4, vol. II, tab 27)

19. The parties met on 9 November 2009 to negotiate the above-mentioned claims. The outcome of that negotiation was memorialized in the Corps' letter to appellant dated 23 November 2009 which listed the government's position on each of the 14 items (app. supp. R4, vol. II, tab 28). The Corps stated: "At the end of the meeting it was requested that a Contracting Officer's Final Decision be provided for those items not agreed to. The Government stated that it would provide a letter within 60 days as to when a Contracting Officer's Final Decision [COFD] would be given." (*Id.* at 1092)

20. As the contracting officer did not issue a COFD on the sheet piling claim, appellant filed a notice of appeal with the Board on a "deemed denial" basis, which was received on 29 September 2010 and was docketed as ASBCA No. 57387.

21. James Pittman, appellant's vice president, testified that he participated in the preparation of the offer which resulted in the contract at issue in the above-captioned appeals (tr. 1/27-28). He indicated that appellant reviewed the contract documents, personally visited the site, and saw no indications that they would not be able to remove the temporary sheet pilings from the ground (tr. 1/72). Mr. Pittman further testified that there were several instances during Phases 1 and 2 that the Corps paid appellant to leave the sheet pilings in the ground "for convenience," as "[i]t had nothing to do with whether we could pull them or not pull them" (tr. 1/73-74). The record shows that several modifications for leaving sheet piles in the ground were issued allowing compensation (app. supp. R4, vol. II, tab 36).

*The Government's Expert:*

22. The Corps offered Richard J. Varuso, Ph.D., as an expert in the field of geotechnical engineering. At the time of the hearing, Dr. Varuso was the Deputy Chief of the Geotechnical Branch of the Corps (tr. 2/140). After *voir dire* of his qualifications, education, and experience with other projects involving the use of sheet pilings, Dr. Varuso was accepted without objection as an expert in geotechnical engineering (tr. 2/144).

10

23. Dr. Varuso opined:

> The foundation conditions for this project are very typical of southeast Louisiana and the majority of the SELA [Southeast Louisiana] projects. The soils encountered within the borings (Son7-U through Son12-U) consist of fill and recent Holocene Age deposits underlain by older Pleistocene deposits. Holocene Age soils consist of inland swamp/marsh, interdistributary, and prodelta clayey deposits to approximate El. -43.5 CD. Pleistocene Age soils (clayey, silty, and sandy deposits) are present from approximate El. -43.5 CD to the various boring termination depths....
>
> ....
>
> The Contractor had to employ various methods to pull several of the sheet pile sections installed for the contract's TRSs. This is not uncommon nor should it have been unexpected by the Contractor given their experience as a contractor on similar USACE projects in southeast Louisiana and their anticipated understanding of the effects of pile set-up....
>
> The likelihood of differing site conditions, either Type I or Type II, in the foundation conditions for this contract causing the inability to remove the sheet piles is improbable.

(Supp. R4, tab 35) Dr. Varuso testified that it is not unusual to experience difficulties in removing sheet pilings, and he has seen contractors on other projects in the area "employ various methods that have been discussed here to remove those sheets" (tr. 2/153). Moreover, he stated that the contractor "experienced difficulty in removing several sections of sheet piles in this contract, not just the 75 that were left in place" (supp. R4, tab 35 at 2). With regard to the soil conditions at the site, he further testified:

> Well, we had a decent number of borings on this contract on both sides of the canal, and then spaced evenly down the canal. And those borings are all very uniform, as much as we typically see in Southeast Louisiana.
>
> ....

11

> Again, very similar soil properties, soil types associated with the borings that were located within this job, showing very consistent foundation deposits along Soniat Canal between West Napoleon and Veterans.

(Tr. 2/156) Thus, based on the way the soils are deposited in the area, Dr. Varuso concluded that it is highly unlikely that variations in the soil would exist in 20-foot increments (tr. 2/159). He reached these conclusions after reviewing, *inter alia*, the geotechnical report dated 22 December 1997 by Eustis Engineering Company, Inc. (Eustis Report), which contained analysis of the soil in the Soniat Canal where the work was to be done (supp. R4, tab 36). The Eustis Report soil borings from the site were included in the contract documents (R4, vol. II, tab E). Based on the foregoing, coupled with the Corps' credible expert testimony, we find that the soils in the project area were typical for the Southeast Louisiana region.

*Appellant's Expert:*

24. Appellant offered Jerry Householder, Ph.D., as an expert in geotechnical engineering and construction management. Dr. Householder testified as to his experience as a professor of civil engineering at several universities, his experience with construction projects that involved driving and extracting temporary sheet piles, as well as his several publications on construction, estimating and cost control (tr. 1/200-02). Dr. Householder was accepted as an expert witness in geotechnical engineering and construction management without objection (*id.* at 205).

25. Dr. Householder's written opinion states, that "[i]n the New Orleans area when sheet piling is to be extracted, it is common to be able to pull virtually all, if not all, of the piling" from the ground. He concludes that if the sheets could not be pulled "it is due to a subsurface soil condition that differs materially from that normally encountered and usually expected" (app. supp. R4, vol. II, tab 30). He examined the soil borings from the Eustis Report with regard to soil cohesion and testified that the cohesive qualities may vary as you move down the canal (tr. 1/211-12). This testimony was not credible as Dr. Householder reached a conclusion based on his speculation that because the sheet piles could not be removed by normal means, there must be a differing site condition without indicating what the specific condition was.

C. *Findings of Fact Pertaining to ASBCA No. 57388 (Flood Events Claim)*

26. The contract also contained the following provisions:
SECTION 01100 – GENERAL PROVISIONS

....

12

## 2. DAMAGE TO WORK

The responsibility for damage to any part of the permanent work shall be as set forth in the Contract Clauses…. However, if, in the judgment of the Contracting Officer, any part of the permanent work performed by the Contractor is damaged by flood, earthquake, hurricane, or tornado which damage is not due to the failure of the Contractor to take reasonable precautions or to exercise sound engineering and construction practices in the conduct of the work, the Contractor shall make the repairs as ordered by the Contracting Officer and full compensation for such repairs will be made at the applicable contract unit price or lump sum prices as fixed and established in the contract. If, in the opinion of the Contracting Officer, there are no contract unit or lump sum prices applicable to any part of such work, an equitable adjustment pursuant to the Contract Clause entitled "CHANGES" will be made as full compensation for the repairs of that part of the permanent work. Any costs associated with flooding of dewatered areas as directed by the Contracting Officer will be paid for by an equitable adjustment pursuant to the contract clause entitled "Changes".

(R4, vol. II, tab D at 110-11)

SECTION 02242 – DEWATERING

….

PART 3 EXECUTION

3.1 OPERATION

The Contractor shall perform dewatering and maintain the work areas in a dry condition as long as is necessary for the work under this contract…. In the event that flooding is deemed necessary by the Contracting Officer, the protected area shall be flooded in accordance with the sequence of flooding proposed by the Contractor and approved by the Contracting Officer…. If flooding is directed by the Contracting

13

Officer, the Contractor will be compensated for damages in accordance with the applicable requirements of the General Provision entitled "DAMAGES [sic] TO WORK", and the Contract Clause entitled "CHANGES"....

### 3.4 TEMPORARY EARTHEN DAMS.

In order to facilitate construction, temporary earthen dams will be allowed in order to maintain dry working conditions. Temporary dams constructed of wood or steel sheeting will not be allowed.

(*Id.* at 224, 228)

27. The term "flood event" is used to describe when the site is flooded either by excessive rainfall or when the CO directs the contractor to flood the work site to allow rainwater to flow through the canal (tr. 1/20). Several contract modifications (A00009 – A00022, but excluding A00019) were bilaterally executed in order to compensate appellant for "standby costs and repairs" for 109 flood events (supp. R4, tab 23). These modifications included payment for standby costs associated with the TRS and the elevated work platform, including sheet piling and timber mats.[2] Commencing with Modification No. P00023, the parties reached an impasse with regard to delay costs associated with the TRS and associated items. Accordingly, the government began issuing modifications that specifically excluded the following: "time extension costs associated with the contractor's sheetpile cofferdam, bracing and bridging materials, timber mats, steel forms, and pontoons which are currently in dispute and will be resolved by separate action" (R4, vol. II, tab C). This was based on the Corps' position that appellant was not incurring any standby costs on materials (which included the separate items that made up the TRS – "sheetpile, timber mats, steel forms, pontoons, bracing materials, and bridge materials") (R4, vol. I, tab U at 4).

28. Between 15 January 2003 and 14 July 2004, appellant submitted several claims totaling $1,422,728 for costs associated with flood events, each of which contained the following language: "The costs that are being requested reimbursed are required to compensate our firm for the extended usage of these items, just as a rental rate would be applicable if these items were obtained on a rental basis from an entity in the marketplace" (R4, vol. I, appx. at 3, *passim*). By letter dated 19 February 2004, the Corps provided the following to Pittman:

---

[2] As stated in footnote 1, the timber mat appeal was denied by the Board wherein we held that the Corps had fully compensated appellant for the delays associated with flood events.

14

> The purpose of this correspondence is to address the outstanding issue arising from the items of costs excepted from settlement of Modifications P00023...and all subsequent modifications that refer back to this one. Specifically, you requested compensation for sheetpile, fabricated work platform, and other items as a result of these materials remaining on the job longer as a result of the changes.
>
> To date, you have failed to demonstrate that you have incurred any additional cost due solely to these materials remaining on the job longer.... Your representation that owned sheetpile should be compensated for at current market rental rates, or that interest is due on the investment based on the value of the materials are not actually incurred costs.

(R4, vol. I, tab Z) After the Board denied the timber mat claim, appellant revised its claims to exclude the timber mats on 18 May 2010 to the amount of $927,204.45 (ASBCA No. 57388, compl., ex. 4).

29. In that revised claim, appellant also included an opinion by Dr. Householder, who concluded that the items at issue should be treated as support equipment and that the method of determining the delay costs is to use either the rental value of the items or one of the recognized formulas to determine delay costs (app. supp. R4, vol. II, tab 33, ex. B).

30. The CO failed to issue a final decision on the claims and appellant filed an appeal to the Board from a deemed denial of the claim. It was received on 29 September 2010 and was docketed as ASBCA No. 57388.

D. *Findings of Fact Pertaining to ASBCA No. 57688 (Gravity Sewer Claim)*

31. Under Section 02531 of the contract, appellant was required to relocate the existing gravity sewer line and manholes. Payment for the work was to be based on "completed work performed in accordance with the drawings, specifications, and the contract payment schedules." (R4, vol. II, tab D at 274)

32. The contract also stated in pertinent part:

> 17.   UTILITIES AND IMPROVEMENTS
>
>> a. All known utilities within the limits of the work, such as pipes, communication lines, power

15

lines, etc., that would interfere with construction work shall be removed, modified or relocated by the appropriate utility at no cost to the Contractor unless otherwise noted in the plans and/or specifications.

(R4, vol. II, tab D at 124)

33. By letter dated 27 January 2003, the Corps told appellant the following with regard to an earlier meeting between the parties:

As discussed at the meeting, it appears that the installation of the 30-inch drainline will conflict in elevation with the gravity and force main sewer lines, however this cannot be determined until some exploratory work on your part is performed. As stated in the general notes section of the contract drawings, "Location of existing utilities indicated on the plan sheets are for informational purposes only and are based, in part, on information provided by the respective utility companies. It is the Contractor's responsibility to verify all existing utility locations prior to construction." Upon receipt of this information, we will provide further direction if necessary for the installation of the drainline.

(Agency supp. R4, tab 8)[3]

34. By letter dated 20 October 2004, appellant requested approval to use a trench box for the installation of the gravity sewer line and manholes, as the usage of timber trench system shown on the drawings may not be the best application for the work (agency supp. R4, tab 9). The Corps responded, by letter dated 17 December 2004, advising that it generally had no objection to the concept of using a trench box. However, the Corps added the following:

Prior to purchasing the trench box, we ask that you submit details of the trench box and a pipe installation plan...for our information. In addition, prior to receiving approval

---

[3] The Corps filed a separate Rule 4 supplement entitled "Agency Supplement to Rule 4 File for ASBCA No. 57688 Tabs 1-33." For ease of reference and to avoid confusion with the previous supplemental Rule 4 filing in ASBCA Nos. 57387 and 57388 (which contain several documents germane to this appeal), we will reference this supplement as "Agency supp. R4."

> for this change, we ask that you provide the difference in
> cost between the wood and trench box shoring system.

(Agency supp. R4, tab 10)

35. By letter dated 15 February 2005, appellant resubmitted the 20 October 2004 request as a "Value Engineering [Change] Proposal" (VECP) (supp. R4, tab 18).

36. Appellant advised the Corps, by letter dated 26 April 2005, that it could not begin construction of the gravity force sewer main until several issues were resolved; including, *inter alia*, the drawings indicate that "the existing sewer line is about two feet lower than the new sewer line is shown to be installed at" and the requirement for a new sewer line where the existing one is working fine (agency supp. R4, tab 14 at 2).

37. The Corps unilaterally modified the contract via Modification No. A00114 (Change Order-011 Sewer Manhole Changes), dated 12 May 2005, to have the new sewer line match the elevations of the existing sewer line. Appellant was directed to immediately proceed with these changes and "[p]ayment for work required by this change will be directed by a separate formal modification which will contain an agreed upon equitable adjustment." (Agency supp. R4, tab 15)

38. Appellant responded, by letter dated 20 May 2005, advising the Corps that it intended to perform an as-built site survey to obtain the exact elevations and provide it to the Corps "prior to actually proceeding to lay the utility referenced." Appellant further added that the costs associated with this survey will be included as part of the subsequent request for payment resulting from the aforementioned change. (Agency supp. R4, tab 16).

39. By letter dated 17 June 2005, the Corps replied to appellant stating: "I have no objection to you providing as-built elevations of the sewer line provided that you do not create additional work beyond what is required to install the new sewer line and manholes at their existing elevations" (agency supp. R4, tab 17).

40. On 26 January 2006, the VECP was incorporated into the contract under bilateral Modification No. P00107 and resulted in a decrease to the contract price by $58,712.82 (supp. R4, tab 19).

41. On 6 March 2006, the Corps, in response to a meeting with appellant at the job site on 22 February 2006 where appellant expressed concerns with the gravity sewer installation and the possibility of a differing site condition, stated the following:

> I believe the remaining work is essentially the same
> work as was bid. I understand there may be some changes
> that have been made such as house connections made to

17

the sewer after the project started, etc. We are also aware that the sewer line will pass beneath a conflict box[4] and that some manholes have been removed. We will address these issues as they are verified during construction of the sewer. Some changes to the work were directed by modification A00114.

You should proceed with the work as required in the contract. If you encounter conditions such as those cited above or other conditions that meet the requirements of Contract Clause 52.236-2, Differing Site Conditions, you should notify me in writing as required by this clause.

(Agency supp. R4, tab 18)

42. Appellant responded, by letter dated 14 March 2006, reiterating that it had determined that there are differing site conditions present with respect to both the vertical and horizontal location of the gravity sewer line and the sewer force main, and alerted the Corps that the government "must now take action to address this problem prior to [appellant] moving forward and proceeding with this work" (agency supp. R4, tab 19).

43. The Corps issued a "**SHOW CAUSE**" notice to appellant dated 3 April 2006, wherein it informed appellant that it had not established a differing site condition because it failed to provide any specific evidence that "the alignment of the gravity sewer line and the sewer force main differ[ed] substantially from that presented in the plans so as to materially alter the character of the work required." Accordingly, the Corps gave appellant ten days to provide its plans and schedule to complete all of the work required under the contract, which included the replacement of the gravity sewer line. The Corps calculated 31 January 2006 as the contract completion date, which included time extensions for weather and pending modifications. However, the Corps gave appellant until 1 June 2006 to complete all work. The Corps added: "If you fail to provide your schedule to complete the work…your right to proceed will be terminated." (Agency supp. R4, tab 20)

44. By letter dated 7 April 2006, appellant notified the Corps that it had completed work on the project and requested a final inspection be performed as soon as possible (agency supp. R4, tab 21). Appellant later requested, by letter date 20 April 2006, a pre-final inspection and that the Corps generate a punch list of items

---

[4] A "conflict box" is "typically a box that you would install at a location where you have multiple utilities, and you may want to change direction of one of the utilities" (tr. 2/108).

that remained to be completed, asserting that the work was "99 % complete" (agency supp. R4, tab 22).

45. Meanwhile, the record reflects that appellant contacted the Jefferson Parish Department of Sewage by letter dated 5 May 2006 and requested that they formulate a plan to: (a) remove, modify or relocate the existing 8" sewer force main (as appellant could not do the work itself pursuant to the project plans and its contract specifications); and (b) replace four of the originally constructed manholes along the existing 12" gravity sewer line (because appellant had originally planned to utilize all of the manholes for the gravity sewer work under the contract) (agency supp. R4, tab 24).

46. On 2 June 2006, the Corps issued a "**Second Show Cause**" notice, which gave appellant another ten days to present a plan and schedule to get the remaining work completed. The Corps added: "If you miss this deadline without a suitable response, I will have to conclude that you are unable or unwilling to pursue the remaining work and I will take appropriate action." (Agency supp. R4, tab 25)

47. By letter dated 15 June 2006, appellant responded to the Corps' show cause letters stating the reasons for its inability to complete the work (agency supp. R4, tab 26). Appellant also referenced several events that took place and documents relating to those events, including a pre-final inspection that occurred on 5 May 2006 and a final inspection on 2 June 2006. However, the record does not contain evidence of the referenced events or evidence of the contents of the documents relating thereto. (*Id.* at 13) We find that appellant demobilized from the site on 10 June 2006.

48. The record further shows that the parties met in August of 2006 to discuss outstanding issues and to finalize the project (agency supp. R4, tab 27). By letter dated 3 October 2006, the Corps addressed the outstanding gravity sewer line issue as follows:

> In our letters dated April 3, 2006 and June 2, 2006, you were given an opportunity to complete the required sewer line work. Since you have failed to complete the sewer line work, a contract modification will be issued to delete the removal and replacement of the gravity sewer line. You will be requested to provide a proposal for deleting this work…. Based on our estimates and available information, I believe that the credit owed to the Government for deleting the remaining work is greater than the remaining amounts owed under the original contract and the total amount of all outstanding

modifications. Therefore, there will be no further payments issued under this contract pending final resolution.

(Agency supp. R4, tab 28)

49. The parties continued to settle outstanding issues under the contract. By letter dated 22 April 2009, the Corps addressed the outstanding issue of the gravity sewer line work. The CO stated: "Since you have failed to complete replacement of the sewer line, I am proceeding with a separate construction contract to accomplish the work." (Agency supp. R4, tab 29) The Corps attached a proposed bilateral modification to delete the work from the contract, which would have resulted in a decrease of $155,289.46 in the total contract price (app. supp. R4, vol. II, tab 18).

50. On 24 April 2009, the deleted gravity sewer line work was awarded to B&K Construction Co., LLC (B&K) via modification to its existing Soniat Canal contract (W912P8-07-C-0007) for $953,845.10 (app. supp. R4, vol. II, tab 26; tr. 2/197, 199). Included in the modification were several drawings created by appellant showing conflict box installation and location of the existing gravity sewer line and the sewer force main (app. supp. R4, tab 26 at CRP 1080-86; tr. 2/114-16).

51. Appellant responded on 11 May 2009, disagreeing with the CO's position stating:

> At no time has [appellant] refused to complete this work, in fact, as clearly indicated by our litany of correspondence dating as far back as October 2004, [appellant] has shown due diligence, asking the [Corps] for Information and Direction, as required by the contract when faced with a situation where Changed Conditions are found to exist on a contract.

Accordingly, appellant did not sign the proposed modification. (Agency supp. R4, tab 30)

52. By letter dated 18 September 2009, the CO informed appellant that the deletion of the sewer line work was based on its "refusal to perform the work as required" by the contract, and thus was deemed abandoned. The CO also cancelled Modification No. A00114 (Change Order-011, Sewer Manhole Changes), which was for work to the sewer line manholes that was never accomplished. Appellant was further advised that the Corps had made other arrangements to accomplish the unfinished work on the sewer line. Enclosed with the letter was unilateral Modification No. P00121, which decreased the contract by a sum total of $155,289.46. (Agency supp. R4, tab 31) Based upon the foregoing, we find that, other than the conflict box work, appellant did not accomplish any of the work on the gravity sewer line.

20

53. Appellant responded to the Corps decision, by letter dated 23 September 2009, contending that the Corps had breached the contract by the issuance of unilateral Modification No. P00121. Specifically, appellant alleged that it promptly advised the Corps of "the discrepancies between the contract documents and the actual condition and location and obstructions related to the installation of the gravity sewer line"; and that the issuance of Change Order-011 confirmed that a material difference did exist. Appellant disputed the Corps' contention that it refused to complete the work, pointing out that the Corps, over a period of several years, had demonstrated an unwillingness to negotiate the outstanding issues. (Agency supp. R4, tab 32)

54. By letter dated 15 October 2009, appellant's counsel requested a settlement conference for all outstanding issues under the Soniat Canal project including the deletion of the gravity sewer line work, which was quantified as $516,667.77 (app. supp. R4, vol. II, tab 22). This amount included the following: (1) "FOOH" (field office overhead) $206,866.98; (2) "Change Order Value" $155,289.46; (3) "Accrued Interest" $61,515.37; and (4) other markups (21.95%) $92,995.96 (app. supp. R4, vol. II, tab 20 at CRP 1025). On 2 November 2009, appellant requested a COFD on the outstanding claims, including the deletion of the gravity sewer line and certified all claims over $100,000 (agency supp. R4, tab 3).

55. On 22 April 2011, the CO issued a decision denying the claim for the gravity sewer line in its entirety. The COFD did not address appellant's claim regarding the existence of a differing site condition. (Agency supp. R4, tab 1; tr. 2/267) However, we find that the issue was, by implication, before the CO for consideration as it was the reason that appellant would not proceed with the work. Appellant filed a notice of appeal on 19 July 2011, which the Board docketed as ASBCA No. 57688.

DECISION

*ASBCA No. 57387 Sheet Piling Claim*

Appellant contends that it encountered a Type II differing site condition, and thus it is entitled to payment for the costs related to the 75 sheet pilings it was "forced" to leave in the ground (app. br. at 1). Appellant alleges that it encountered an unknown physical condition at the site and tried a number of extraordinary measures to extract the piles (*id.* at 2). Because all other variables remained constant in the equipment, materials and methods used to drive and extract these temporary sheet pilings, appellant concludes that it had encountered a Type II differing site condition – "namely, strata of subsurface soils with excessively strong adhesive qualities, which were unusual and unknown, and which differed materially from the soils that [it] ordinarily encountered in the greater New Orleans area while driving and extracting temporary sheet piling" (*id.* at 3).

The Corps counters that appellant has not "identified the specific differing site condition to which it alludes, but relies on the assertion that, since it took all reasonable steps to extract the sheet pilings but could not do so, the only remaining explanation must be the existence of a Type II differing site condition" (gov't. br. at 13). The Corps alleges that appellant did not conduct an investigation into the subsurface conditions at the job site, and has not offered any specifics as to the alleged differing site condition that prevented it from removing the sheet pilings. Thus, the Corps concludes that appellant has failed to meet its burden to establish the existence of a Type II differing site condition. (*Id.* at 35-36) Moreover, the Corps further adds that appellant has not demonstrated that it incurred costs due to the inability to remove the sheet pilings because it invoiced the full cost of these items through progress payments (*id.* at 55).

A contractor asserting a Type II differing site condition claim is "confronted with a relatively heavy burden of proof." *Huntington Construction, Inc.*, ASBCA No. 33526, 89-3 BCA ¶ 22,150 at 111,479 (citing *Charles T. Parker Construction Co. v. United States*, 433 F.2d 771 (Ct. Cl. 1970)). In order to qualify as a Type II differing site condition, "the unknown physical condition must be one that could not be reasonably anticipated by the contractor from his study of the contract documents, his inspection of the site, and his general experience[,] if any, as a contractor in the area." *Randa/Madison Joint Venture III v. Dahlberg*, 239 F.3d 1264, 1276 (Fed. Cir. 2001) (quoting *Perini Corp. v. United States*, 381 F.2d 403, 410 (Ct. Cl. 1967)).

The contract documents and soil borings clearly show the soil was typical for the area (finding 23). Contract borings are the most significant indicator of subsurface conditions. *Nova Group, Inc.*, ASBCA No. 55408, 10-2 BCA ¶ 34,533 at 170,322. We agree with the government's expert that it is highly unlikely that based on the soil borings in the contract, variations in the soil would exist in 20 foot increments. What was apparent was that appellant could not remove some of the pilings using its usual means and methods of extraction. The plain fact that they could not be removed does not necessarily mean, absent further evidence, that it must be as appellant contends. Here, appellant has offered no further evidence to prove its case that the inability to extract the piles was caused by a Type II differing site condition. Appellant speculates that because it had difficulty removing some of the sheet pilings, a Type II differing site condition must have existed. Its proof of the differing site condition consists solely of its difficulty in removing sheet pilings. This circular argument cannot prevail. Thus, appellant has failed to meet its burden that it encountered a Type II differing site condition.

Appellant further contends that because it was previously compensated for leaving pilings in the ground at various other points along the work site that it proves that the Corps "recognized that these sheet pilings were an asset that belonged to Pittman, and Pittman was entitled to an equitable adjustment for the loss of this asset" (app. reply br. at 12). We disagree. To the extent that appellant argues that its "prior course of dealing" with the government should dictate the outcome of this matter, we

disagree. In our previous decision under the timber mat claim, under the subject contract, we stated the following:

> Section 223(1) of the Restatement (Second) of Contracts (1981) defines a course of dealing as: "a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Section 1-205(1) of the Uniform Commercial Code (U.C.C.) defines "a course of dealing" as: "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." The courts have held that a single transaction cannot constitute a "course of dealing" within the meaning of U.C.C. § 1-205(1). See *International Therapeutics, Inc. v. McGraw-Edison Co.*, 721 F.2d 488, 492 (5th Cir. 1983); *Product Components, Inc. v. Regency Door and Hardware, Inc.*, 568 F. Supp. 651 (S.D. Ind. 1983). We have said in *Western States Construction Company, Inc.*, ASBCA No. 37611, 92-1 BCA ¶ 24,418 at 121,894:
>
>> While there is no magic number of contracts that must be performed before this principle is applicable, the parties' prior dealings must be regular and/or numerous enough to cause a reasonable expectation that the conduct relied upon was not mere accident or mistake, but was the performance actually expected by the other party.

*C.R. Pittman*, 08-1 BCA ¶ 33,777 at 167,178. The record demonstrates that these other instances of compensating appellant to leave pilings in the ground were done bilaterally under the Changes clause (app. supp. R4, tab 36). We assume that the Corps made a decision in its best interest and discretion to leave those pilings in place. With regard to the pilings that are the subject of the claim at issue, leaving the pilings in the ground was done for appellant's convenience – i.e., it could not remove them; and not for the benefit of the Corps. The fact that the Corps chose to compensate for one and not the other was reasonable.

As appellant failed to prove the existence of a Type II differing site condition, the alleged crane damage due to excessive effort to remove the questioned sheet pilings is also denied.

23

Appellant alleges that it is entitled to the standby costs associated with the TRS remaining on the job longer than anticipated. Unlike the timber mats (which were deemed "material" by the Board in *C.R. Pittman*, 08-1 BCA ¶ 33,777 at 167,177-78, and thus consumed), appellant contends that the TRS is similar to items listed in the equipment schedule (EP 1110-1-8) such as work barges and platforms (app. br. at 14). Because appellant supplied its own TRS platform and the project went beyond the original 900 contract days, appellant believes that it "is entitled to an equitable adjustment to compensate it for the ownership and operating costs associated with its investment in this equipment" (*id.* at 18).

The Corps concedes that appellant did incur costs associated with delays due to the 109 flood events. However, the Corps avers that it already compensated appellant for those delays and appellant has failed to establish that it is entitled to anything further. (Gov't br. at 20) Specifically, the Corps contends that appellant recovered the full purchase and fabrication cost of the TRS and the elevated work platform, etc., through progress payments (*id.* at 21, 23). With regard to the classification of the TRS and other items mentioned above as equipment, the Corps believes that this classification is only relevant to determine quantum, not entitlement (*id.* at 26). Once appellant has recovered the full value of the item, regardless of the classification of the item as equipment or materials, through progress payments, the Corps contends, "it no longer has an ownership cost associated with that item" (*id.* at 28). To support its proposition, the Corps cites *Hicks & Ingle Co. of Va., Inc.*, ASBCA No. 39711, 90-2 BCA ¶ 22,897, where we held that the clear language of the payments clause of that contract dictated that equipment that was fully paid for via progress payments became the sole property of the government.

Appellant replies that the Corps "bought" the use of the TRS on a lump sum basis for 900 days. The invoices submitted to the Corps did not represent the full cost of purchasing and fabricating the TRS and construction bridge. (App. reply br. at 2; tr. 1/158-59) Appellant distinguished *Hicks* by pointing out that in the present case, the Corps never claimed that it was entitled to keep the construction bridge and TRS after the Soniat Canal job was completed; while in *Hicks*, the government did in fact make such a claim (app. reply br. at 6).

Contrary to the Corps' assertion, the ultimate question of whether the ownership costs for the TRS and associated items are allowable under the contract does indeed boil down to whether the items can be categorized as equipment (and thus an allowable delay cost under the contract) or materials. Appellant's expert, Dr. Householder, explained that in the construction industry, the standard term "equipment" is used to define all items brought to the job to assist in the construction process. Equipment can be broken down into two categories: (1) production

(equipment brought to the job to accomplish a single purpose); and (2) support (equipment brought to the job to assist in the work – i.e., scaffolding). Thus, Dr. Householder opined that the sheet piling, bridge sections, and structural bracing are support equipment. (App. supp. R4, vol. II, tab 29 at CRP 1098)

The Corps did not offer any expert testimony, but does point to several references in the record as well as a previous decision to dispute appellant's expert opinion. Specifically, the Corps alleges that the work platform/TRS was not simply constructed to assist in the performance or execution of the contract work, but was a required feature of the contract work. It cites that the government estimators considered all of the TRS components, including the sheet piles and structural bracing as well as all items that went into the construction of the elevated work platform to be materials. (R4, vol. I, tab T) Moreover, the sheet piling descriptive literature and leasing agreement with SkyLine Steel referenced them as construction materials (supp. R4, tab 15 at 3) or "materials" (app. supp. R4, vol. I, tab 17). The Corps cites a previous decision from the Engineer Board that refers to sheet piles as "materials." *See J.A. Jones Construction Co.*, ENG BCA No. 6348 *et al.*, 00-2 BCA ¶ 31,000. Finally, the Corps refers to the equipment manual (EP 1110-1-8) and notes that it contains no equipment that is remotely similar to the work platform/TRS. Thus, the Corps concludes that the function of the work platform/TRS does not accord with the common sense understanding of the term "equipment" and appellant's position is not well taken. (Gov't reply br. at 47-49) We agree.

The Corps viewed these items as materials and appellant never questioned their categorization until the cost dispute arose. We are unpersuaded by appellant's arguments and evidence to the contrary. Accordingly, we hold that the TRS system consisted of materials that did not transform into equipment when put together into an elevated platform and temporary retaining structure. As such, the appeal is denied.

*ASBCA No. 57688 Gravity Sewer Claim*

Appellant contends that it encountered a Type I differing site condition with regard to the gravity sewer line portion of the contract because there was a variation between the expected conditions and what it actually encountered at the site. Specifically, the contract drawings showed that the gravity sewer line running parallel to the sewer force main, while in actuality the gravity sewer line ran underneath the sewer force main, in some places, and approximately two feet lower than the elevation in the contract. (App. br. at 29) Thus, appellant contends that requiring a contractor "to proceed with the work and to assume responsibility for any damage that might occur, without agreeing in advance to compensate Pittman for repairing this damage, is a breach of contract, and is contrary to the purpose of the Differing Site Conditions Clause." To support its proposition that it did not have a duty to proceed with

25

construction until the issue was settled, it cites *J. Parr Constr. & Design, Inc. v. United States*, 996 F.2d 319 (Fed. Cir. 1993) (table)[5] as authority. (App. br. at 30)

The Corps argues that appellant has not met its burden of proof to establish the existence of a differing site condition because it presented no evidence that it reasonably relied upon its interpretation of the contract and contract-related documents. Moreover, the Corps contends that the record is devoid of evidence showing the "differing" condition it actually encountered in the field; appellant relied on "conclusory statements and vague and unsubstantiated allegations." Furthermore, the Corps avers that the drawings that appellant prepared for the installation of conflict boxes that showed the existing utilities (Pittman drawings), including the gravity sewer and sewer force main were "three and a half feet" (tr. 2/114-15) to "five foot, eight inches" apart (tr. 2/55-56). Further testimony from the ACO (Stephen Hinkamp) and the project engineer (Robert Guillot) for the canal work indicated that the distances between the lines on the Pittman drawings were similar to what was indicated on the contract drawings (gov't br. at 49-50). Finally, appellant did not incur any costs associated with its claim because it did not perform the gravity sewer line work (*id.* at 54).

Although not addressed in the COFD, appellant's Type I differing site condition claim is intertwined with its breach of contract claim. During the hearing, the CO testified with regard to the reasons appellant's claim was denied: "I didn't deny the claim for any reason related to the...alleged differing site condition.... I found the claim didn't have merit because C.R. Pittman didn't install the sewer line and did nothing to expose whatever differing site condition that they felt existed." (Tr. 2/267) Thus, the Type I differing site condition claim was denied by implication (finding 55).

To recover under a Type I differing site condition claim, the contractor bears the burden of proof showing that conditions actually encountered differed materially from those "indicated" in the contract. *Foster Constr. C.A. & Williams Bros. Co. v. United States*, 435 F.2d 873, 881 (Ct. Cl. 1970). A contractor cannot be eligible for an equitable adjustment for Type I changed conditions unless the contract indicated what those conditions would supposedly be. *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed. Cir. 1984); *S.T.G. Construction Co. v. United States*, 157 Ct. Cl. 409, 414 (1962).

Here, appellant fails to meet that burden. It could not offer any proof of what it encountered because it never began construction (finding 52). The applicable contract clause and numerous cases all contemplate that a comparison between the drawings and what was actually encountered at the site must be done in order to prove that a

---

[5] Appellant cites to the tables showing that the Federal Circuit affirmed "without opinion" the Court of Federal Claims decision. However, the tables are not citeable as precedent. Thus, we discuss the case reported below at 24 Cl. Ct. 228 (1991).

material difference exists. Appellant cannot prevail on a differing site condition without this crucial piece of the puzzle. Thus, appellant's arguments must fail.

Appellant's reliance on *J. Parr Constr.* is misplaced as that case stands for the proposition that the duty to proceed with work under a contract is not absolute when conditions at the job site differ materially from those in the contract so that a contractor possesses a reasonable fear of danger. In *J. Parr Constr.*, the contractor was terminated for default because it abandoned the project (due to unfounded safety concerns), poor work quality, and failed to comply with environmental regulations. This is not applicable to the instant appeal as appellant never notified the Corps that it was not safe to do the contractually-required work.[6]

Further, the Corps' action to descope the contract to award the work to B&K was also reasonable. The record shows that the Corps awarded the work to B&K on 24 April 2009, nearly three years after appellant had demobilized the work site (finding 47) and the government had considered the work abandoned. Accordingly, appellant's breach of contract claim is denied.

## CONCLUSION

The appeals are denied.

Dated: 4 February 2015

_____
OWEN C. WILSON
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

_____
MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

_____
RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

---

[6] In any event, Court of Federal Claims decisions are not binding precedent for this Board.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 57387, 57388, 57688, Appeals of C.R. Pittman Construction Co., Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

28